Filed 4/8/25  In re A.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.P., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY AND CHILDREN FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>L.P.,<br><br>    Defendant and Appellant. | E083322<br><br>(Super.Ct.No. J296720)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Gorman Law Office and Seth F. Gorman, for Defendant and Appellant.

Thomas Bunton, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

This is an appeal from jurisdictional and dispositional orders relating to a child, A.P., who was four years old at the time of the dependency hearing. Mother, L.P., and Father, N.P., are both medical doctors at Loma Linda University Medical Center (LLUMC) who were involved in a family law custody matter that poured over into the juvenile court. Mother applied in the family court for domestic violence restraining orders against Father, but, after granting temporary orders, the final restraining order was denied due to lack of evidence of any physical violence. The family court then ordered joint custody with unsupervised visits for Father and Mother's campaign to restrict his contact with the child. Immediately after each unsupervised visit with Father, Mother took the child, A.P., for medical examinations as soon as the child returned to Mother's residence, with an array of concerns not found to involve abuse or neglect, and even requested welfare checks on the child while Father exercised visitation.

Mother complained that the child was displaying symptoms of trauma and regressive behavior at medical appointments, which Mother suggested was an indication of abuse or neglect by Father during his visits. Eventually, one doctor made a mandated report of suspected child sexual abuse at mother's behest, and juvenile dependency proceedings were initiated. However, a full investigation by the San Bernardino County Children and Family Services (Department) yielded no valid concerns of abuse or neglect by Father during visits. Instead, the Department determined there were no safety concerns, but, based on Mother's relentless efforts, the Department filed a petition under

Welfare and Institutions Code[1], section 300, subdivisions (b)(1) and (c), alleging the child was suffering or at risk of suffering harm from emotional abuse inflicted by Mother. The child was detained with Father.

At one point, after Mother appeared to show progress in her pre-jurisdiction services, the Department recommended dismissing the dependency with exit orders. But shortly after making the recommendation, Mother resumed her campaign by reporting suspected sexual abuse by Father, ultimately deemed to be unfounded, and thereby caused the Department to change its recommendation, recommending true findings on the allegations against Mother. As a result, the juvenile court made jurisdictional and dispositional findings on all allegations against Mother, awarded Father sole legal and physical custody of the child, and granted Mother supervised visitation. Mother appeals.

On appeal, Mother contends (1) the juvenile court erroneously excluded evidence of two witnesses, proffered as experts, to support her credibility and demonstrate the reasonableness of her actions, and argues (2) the evidence was insufficient to support the jurisdictional findings and (3) the dispositional order awarding legal and physical custody of A.P. to Father. We affirm.

**BACKGROUND**

In July 2021, the parents separated, and Father later filed for dissolution of the marriage to Mother. In March 2022, after Father filed his petition, Mother sought restraining orders against Father, but after issuing temporary orders, the trial court denied

---

[1] All further statutory references are to the Welfare and Institutions Code, except where otherwise indicated.

3

the permanent restraining orders on February 23, 2023, because Mother failed to meet the burden of proof where the sole incident alleged by Mother related to a verbal argument. The family court ordered joint legal and physical custody, and granted Father unsupervised visitation with A.P. The visits were to begin on February 26, 2023, and, commencing in March 2023, Father was to have unsupervised overnight visits.

Immediately after the first visit with Father following the issuance of the family law orders, Mother took the child to LLUMC[2] on February 27, 2023, after Father's first unsupervised visit with A.P., with a report the child complained of hitting her head in a fall. The doctor discharged A.P. with no concerns about non-accidental trauma.

That same day, Mother appealed from the order denying her application for restraining orders, but the record reflects no further action in connection with that appeal, and the social worker referred to it as having been denied.[3]

On March 1, 2023, the Department received a referral alleging emotional abuse of the child by Father. The allegations of the referral included the following information: after the child had her first unsupervised visit with Father on February 26, 2023. The child reported to Mother that she had "a fall" while in the Father's care. Mother took the child to LLUMC on the following day with concerns the child may have suffered a "head

---

[2] Both parents had attended medical school and were currently employed at LLUMC.

[3] The docket reflects that the appeal was dismissed on March 28, 2023, due to failure to timely pay the filing fee or show cause why the fee should be waived. (<Https://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=42&doc_id=2511 636&doc_no=E080773&request_token=NiIwLSEnXkg%2BWzBJSCJNWE5JQDw6Ulx bKyJeWz1TQCAgCg%3D%3D> [as of Apr. 07, 2025].)

4

injury" from the fall; however, doctors discharged the minor and noted they had "no concerns of non-accidental trauma." Then, on February 28, 2023, at 7:22 p. m., Mother took the child back to LLUMC because the child appeared "altered," and Mother reported the child had been "acting differently" since "starting visits." Mother shared that since A.P. returned from her first visit with Father, she has been recording and taking photos of the child "laying alone on the couch/floors." Mother stated the child has been "disconnectcd, alone, and going into corners."

The county social worker spoke with a social worker from LLUMC who advised that Mother and maternal grandfather had contacted him several times to inquire whether a child abuse referral had been made, and to ensure that any referral was made "correctly.' " The LLUMC social worker noted no concerns for the child, who had clearly explained she fell, although that social worker expressed concern that Mother was bringing the child in for unnecessary examinations. The referral was evaluated out as there were no concerns of abuse or neglect.

On March 8, 2023, a new referral was received alleging sexual abuse of the child by Father. In this referral, Mother described uncharacteristic behaviors by the child following her two unsupervised visitations with Father. For example, Mother reported that the child has been " 'lying on her stomach a lot and raising her butt up,' " and "making thrusting movements." Mother also stated the child placed a toy near her groin, over her clothing, complains of nausea frequently, was eating less, and was tired often. In addition, the child had begun urinating on herself, despite being potty-trained, and had

three accidents in the previous week. Mother took the child to see her regular pediatrician on that occasion, at which a genitourinary (GU) exam was conducted, but the child cried throughout the exam and urinated on herself during the exam.

On March 10, 2023, the Department attempted to contact the child's pediatrician, Dr. Lamb, about this incident and the report, but was advised that the doctor was on vacation and would be gone for several weeks. However, a nurse in his office reviewed the child's medical notes and confirmed the child was seen on March 8 due to concerns of sexual abuse, and that Dr. Lamb had conducted a genitourinary (GU) exam, during which, the child had an accident and cried throughout.[4]

On March 15, the social worker contacted Father regarding the allegations, but Father indicated he had had two visits that went well, but that after each visit, Mother had rushed the child to the emergency department with allegations of abuse or neglect. On March 21, Father sent pictures of various bruises and cuts that were on the child's legs when she arrived for his weekend visitation, informing the social worker that Mother had provided no explanation. When Father asked the child how the injuries occurred, the child stated that "[t]hey threw me down the stairs and you got mad." When the social worker attempted to reach Mother at her home on that same date, however, no one responded, although the social worker heard voices within.

---

[4] Later, Dr. Lamb contacted the social worker after finding a telephone message, and informed the social worker he was not on vacation when the social worker contacted his office.

That same date, the Department was contacted by Dr. Lamb to relay that as of March 15, Mother had not heard anything from the agency regarding the referral and that both Mother and Dr. Lamb wanted information on the status of the referral. When the social worker spoke with Dr. Lamb that same date, he indicated that he did not receive the social worker's message from March 10, 2023 and he was not on vacation at the time of the social worker's prior visit to his office.

On March 23, the social worker met with Mother and child at Mother's home. The child appeared nervous and would not engage with the social worker. Mother produced a notebook in which she had logged incidents, including medical appointments, communication with Father, letters, and quotes from the child and Father. Mother also kept photo albums on her cell phone documenting the child's behaviors, doctor visits, and text messages.

The Mother described what she believed to be concerning behaviors, but which, to the social worker, appeared to be nothing more than age developmentally appropriate behaviors. Mother also showed the social worker a video of the child in which Mother insisted the child was slurring her speech, but when the social worker indicated she did not observe slurred speech, Mother indicted that the slurred speech was on a different video. When asked, Mother denied accusing Father of any kind of abuse or neglect, but simply wanted the social worker to see the "uncharacteristic behavior[s]" of the child. Mother also indicated that she was a victim of a domestic violence incident in 2020,

7

indicating that Father pushed her and "bent her phone."[5]  However, law enforcement reports reflected that there were no allegations of physical contact between Mother and Father during the incident in question, nor was there any report of damaged property.

Mother then described Father's preference for oral sex, attempting to relate this to the child complaining of "mouth pain" following visitation with Father.  But when the social worker asked if Mother was accusing Father of sexually abusing the child, Mother became defensive and denied making any direct accusation of any abuse by Father.  Up to this point, the child had made no disclosures of abuse and there was no evidence to suggest abuse had occurred in Father's home.  Mother was advised that the parents were to refrain from making Zoom calls to the child while the child was visiting with the other parent.

On March 24, Father indicated to the social worker that he found a note dated February 27, 2023, prepared by Dr. Brian Lonquich of LLUMC, following Father's first visit with the child, indicating that Dr. Lonquich shared Mother's concerns about unsupervised visitation and was particularly concerned about the child's ongoing welfare. Dr. Lonquich indicated that he encouraged more supervised visitation to ensure the child's safety.  Father was worried that because Mother was a neurologist at LLUMC and attended the university, she was utilizing her friends and colleagues as assets against him; he adamantly refuted the statements made by Mother regarding suspected abuse. Dr. Lonquich did not respond when the social worker attempted to contact him.

---

[5]  This reference is to the domestic violence report made by Mother prior to the family court order granting Father unsupervised visits.

On March 31, a LLUMC social worker contacted the Department to advise that Mother had taken the child to LLUMC on that same date for concerns of non-accidental trauma and had requested that the child be seen at the Children's Assessment Center for a forensic sexual abuse medical examination. On April 1, the social worker visited the child at Father's home, where the social worker found the child was open and engaged during the contact and did not manifest any fear or nervousness in the presence of the social worker.

On April 3, Mother's therapist, Elisa Comvse, made a referral alleging general neglect by Father to the Department. The next day, the social worker contacted the therapist about the referral, in which the therapist related Mother's allegations that the child continued to display regressive behaviors, such as, the child was urinating on herself and putting toys on her vaginal area, which Mother cited as suggesting abuse and neglect occurring in the Father's home. Mother had also complained to the therapist about Father refusing to allow Zoom phone calls or visits while the child was visiting with Father.[6] The therapist was unaware that an investigation by the Department had already been initiated, expressing surprise because Mother had been " 'so open' " about everything except the Department's involvement.

---

[6] In March 2023, prior to the filing of the petition, Father had requested permission from Mother to have Zoom contact with A.P. during Mother's visits, but Mother had refused. Nevertheless, Mother contacted the child using Zoom, and apparently recorded more than one contact. The social worker informed Mother that neither parent was to request a Zoom call while the child was visiting with the other parent.

On April 4, the social worker contacted Mother about her recent (April 3, 2023) request that the child undergo a forensic sexual examination, and inquired why Mother continued to push this request despite the two previous GU examinations that yielded no findings of abuse or neglect. The social worker indicated that there was insufficient evidence to warrant a SART (Sexual Assault Response Team) exam, and Mother indicated that she was not aware that such an examination would be invasive and traumatic.

Mother also indicated that after she had made the request, a detective had come to her home and attempted to examine the child for evidence of abuse or neglect as part of a criminal child abuse investigation, but Mother would not permit the examination. The social worker spoke to the detective who confirmed that he had been denied access to the child and indicated that he had no concerns of sexual abuse.

Due to concerns of emotional abuse by Mother to the child, a safety plan was created whereby the child would temporarily stay with Father. At this proposal, Mother refused the plan and retracted all her statements regarding the child's behaviors, indicating that since the last referral, the child's behaviors had resolved, and Mother never wanted the Department to become involved.

On April 7, the Department obtained a protective custody warrant to detain the child from Mother, but the maternal family refused to turn the child over to the law enforcement officer who was present to assist in executing the detention warrant. The child ultimately had to be removed from the maternal aunt's arms and, while initially

10

upset, the child was easily consoled. The child was taken to Father's home where the child appeared at ease.

On April 11, 2023, the Department filed the dependency petition alleging under section 300, subdivisions (b)(1) and (c), that the child is suffering serious emotional damage as a result of the conduct of Mother in persistently taking the child for unnecessary, invasive exams, coaching and/or emotionally manipulating the child for sympathy, giving rise to regressive behaviors such as urinating on herself, nausea, lethargy, loss of appetite, tantrums, and/or weight loss.

On April 12, 2023, the court held a detention hearing at which Mother and Father were present, and Mother offered testimony on the issue of detention, repeating the litany of complaints about the child's behavior which allegedly commenced as soon as Father began exercising visitation. Mother indicated that the child appeared to be improving from initial behavioral concerns exhibited following Father's first unsupervised visit with the child, and she denied making statements about the child rubbing a toy on her groin, although she did disclose the child was putting a toy between her legs.

Mother acknowledged in her testimony that she had discussed Father's preference for oral sex in a separate conversation with the social worker, but denied the reference was made in connection with her concerns about the minor's mouth pain and indicated that she never intended to insinuate that Father was sexually abusing the child. Mother denied that she ever requested that the child be seen for a forensic sexual abuse examination.

11

The court ordered the child removed from Mother and maintained in the custody of Father pending the jurisdiction hearing. The court granted Mother supervised visits, one time per week for two hours. In addition, the court authorized a forensic interview of the child, to be conducted by the Riverside County Children's Assessment Center (C.A.C.).[7]

On May 4, 2023, the court held a combined jurisdiction and disposition hearing at which Mother and Father were present. For the hearing, the Department submitted its report filed May 1, 2023, recommending that the court find allegations true, remove the child from Mother and dismiss the matter with custody awarded to Father. Father was interviewed for the report and indicated that the child was afraid of bedtime, so he had to prepare the child for bed a few hours beforehand. He reported that the child had a few incidents of urinating on herself since being in his care, and that she was fearful of going to a doctor. Father took the child to the forensic interview in Riverside, but it could not be completed due to the child's emotional state. The report also indicated that during two supervised visitations with Mother, the child urinated on herself. At the hearing, the matter was continued to allow a substitution of counsel for Mother.

On May 31, 2023, Mother and Father were present in court, but the matter was continued to allow Mother time to further engage in services and for a potential modification to the Department's recommendation. At the next hearing date on July 19,

_____

[7] The recommendation for the interview to be conducted by the Riverside C.A.C. was made because the San Bernardino C.A.C. is affiliated with LLUMC, where both parents are employed.

the Department prepared an addendum report requesting that the court grant another continuance to allow for a transition plan to return the child to Mother's care.

The addendum report indicated visitation was reportedly going well, though there were concerns with Mother's attempts to embellish the child's reactions at the end of visitation, to make it appear the child did not want to leave her. Additionally, a visitation monitor expressed concerns that maternal family was attempting to influence the child's feelings about placement with Father. The visitation monitor expressed concerns with Mother's lack of parenting or structure for the child during visitation and that Mother needed significant help with parenting the child.

However, Mother had attended therapy and had made some progress, although there were ongoing concerns about her ability to coparent with Father. A.P. also participated in therapy and a progress report reflected that the child continued to be fearful of Mother taking her to the doctor and having doctors look at her. Unsupervised visitation was scheduled for Mother. At the hearing, the court continued the matter to October 24 to allow for unsupervised contact with Mother to begin. The court ordered that the maternal grandparents be excluded from Mother's visitation.

Prior to the next hearing set for October 24, the Department submitted an additional information report with a status update on the matter. This report indicated the child was still fearful of Mother taking her to the doctor but was willing to allow Father to take her to the doctor if she was sick or injured. The parents appeared to be willing and able to coparent the child and had agreed upon a custodial arrangement upon the

13

conclusion of juvenile court involvement.  The Department recommended that the court find the allegations true and that the matter be dismissed with family law orders granting joint custody to the parents.

At the hearing, Father's stand-in counsel asked to set the matter for a short cause contested hearing to allow Father's regular attorney to be present.  The court also indicated that it understood that Mother was to transition back into the home of the maternal grandparents and requested an update as to the status of that transition.  The matter was continued for further hearing.

At the next hearing, on January 9, 2024, Mother appeared with another new counsel, her fifth in the matter.  The Department submitted another additional information report reflecting the status of the child's transition into Mother's home.  It was reported that the child was adjusting to the joint custody arrangement and that the parents were willing to engage in services regarding coparenting the child.  The Department continued to recommend that the court sustain the allegations and dismiss the matter with a family law custody order.  The matter was continued to February 5, 2024, for a further short cause contest.

Prior to the February 5 hearing, the Department submitted an addendum report, with a new recommendation that the court find allegations true and dismiss the matter with sole physical and legal custody to Father, with supervised visitation for Mother.  It was reported that it had appeared the parents were demonstrating an ability to coparent the child and they appeared to be doing so without issues, until January 29, 2024, when

the Department received yet another new referral initiated by Mother, alleging sexual abuse perpetrated by Father on the child.

In the new referral, Mother again reported that the child had begun acting differently and made disclosures to Mother concerning sexual abuse. Mother reported that the child was putting the tail of a stuffed animal near her vagina and stating, " 'he put it too deep,' " asked Mother whether her clitoris " 'would come out,' " and inquired what the purpose of her nipples was. Mother also indicated that the child had been doing a " 'humping motion' " on the ground. When Mother asked the child if Father had abused her, the child reportedly responded, " 'daddy said don't tell mommy.' "

Based on this referral, the social worker visited Father's home on February 1, 2024, and was greeted by Deputy Vaca of the sheriff's department, who indicated he was there to conduct a welfare check at Mother's request due to concerns of sexual abuse. The child was interviewed and denied any concerns of physical or sexual abuse. Mother provided a video to law enforcement taken in August 2023, shortly after she was granted unsupervised visitation, showing she had immediately begun interrogating and recording the child, in preparation for a claim regarding sexual abuse. Mother did not cooperate for an interview.

The addendum further related that law enforcement had been contacted to perform two recent welfare checks on the child while she was at Father's home due to Mother's concern of sexual abuse perpetrated by Father. The first, on January 26, 2024, was initiated by a psychologist, Leslie Dobson. Regarding the referral initiated by

15

psychologist Dobson, Deputy Vaca (the officer who conducted the welfare check of the child) expressed concerns with Dr. Dobson as she had provided varying and contradictory statements to law enforcement regarding her psychological examination of Mother. There was also concern that she had made a report to law enforcement based solely upon Mother's statements. When Dr. Dobson was advised that the Department would be contacted regarding the allegations, the psychologist responded that "I wouldn't do that' " as " '[t]he father has an open lawsuit against CFS [the Department]."

The second was on January 30, 2024, initiated by Mother and took place at approximately 1:00 a.m. After conducting these welfare checks, law enforcement indicated there were no concerns regarding the child's care in Father's home.

On February 1, 2024, the social worker made an announced visit to the Father's home, where a sheriff's deputy was present, having been asked to conduct a welfare check at the request of the mother due to concerns regarding sexual abuse and general neglect. After that welfare check, the sheriff's deputy informed Mother there were no concerns for sexual abuse from the last two welfare checks conducted and inquired why Mother continued to make the requests, to which Mother responded she was fearful of Father. The deputy concluded there were no safety concerns with the child at Father's home.

The addendum report also noted that when the social worker contacted Dr. Dobson, the psychologist informed the social worker she had been retained by the dependency court to perform an evaluation of Mother. The social worker advised her that

16

no such order for an evaluation had been made, so Dr. Dobson then indicated that she was retained by Mother's attorney. Dr. Dobson acknowledged never meeting Father or the child but became aware of sexual abuse concerns during her evaluation of Mother.[8] Despite no contact with either the child or the Father, Dr. Dobson referred to Father as a "sexual deviant" and asserted he was a sexual predator. Thereafter, Dr. Dobson texted the social worker numerous times to inquire whether the child was going to be removed from Father's custody.

It was because Mother continued to make baseless accusations of sexual abuse against Father and utilized the child in her attempt to have the child removed from Father's care that the Department decided to modify the prior recommendation.

At the February 5, 2024, hearing, the matter proceeded to trial on the Department's new recommendation. Mother sought to elicit testimony from Dr. Rania Khan, proffered as an expert document reviewer, who reviewed the records of four doctor visits to which Mother had taken the child. Mother's counsel made an offer of proof that the testimony was relevant to show the reasonableness of the numerous medical visits to which Mother

---

[8] Like Mother and Father, Dr. Dobson was affiliated with LLUMC. Additionally, it appears Dr. Dobson initially sent a letter to the Department in January 2024 requesting that the child be removed from her father, based only on the matters related to her by Mother which repeated information previously reported, and concluding, "I believe the mother to be telling the truth." A more formal report, addressed to Mother's counsel, was dated January 31, 2024, indicating several dates of assessment and evaluation of Mother, for the purpose of determining if Mother was feigning or malingering mental health symptoms. This report indicates that Mother's history was reviewed for the purpose of making the report.
    At the hearing, Mother testified that she feared for A.P.'s safety while in Father's care due to Dr. Dobson's report.

subjected the child, given that there were positive findings at each visit that were consistent with sexual abuse.

However, upon voir dire, Dr. Khan testified she was a general medicine doctor, who did not specialize in pediatrics, but who did her residency in family medicine and her practice did not include consultations on evaluations for child abuse. She was not board certified as a pediatric forensic doctor, although she has seen over 5,000 patients (1 to 200 of those being children) in her practice over her seven years as a doctor. She testified that if she suspected sexual abuse as to one of her patients, she would refer the matter to her facility's sexual abuse specialist team.

The court noted that the witness did not possess a level of expertise that would help the court in determining the veracity of the allegations, and that the witness would need to have some specialty regarding sexual abuse investigations to qualify as an expert as proffered. Counsel for Mother then suggested that Dr. Khan be qualified as an expert to testify as to the records she reviewed in this case, and to offer an opinion that the doctor were reasonable. The court concluded she did not qualify as an expert.[9]

After Mother testified, her counsel proffered the testimony of Dr. Dobson to testify about Mother's credibility. After objections were made on relevance grounds, the trial court denied the request to call Dr. Dobson testify, due to the purpose of the evaluation being to address Mother's mental health and credibility. However, due to the lack of allegations relating to Mother's mental health, as well as the irrelevance of character

---

[9] We observe that Dr. Khan's responses during voir dire did not demonstrate any special training or experience in document review.

evidence in the proceeding, the bias in the report, and the fact that credibility determinations are made by the court, the court excluded the proffered testimony.

Following argument by counsel, the court sustained the allegations under section 300, subdivisions (b) and (c). It found true allegations (b-1) and (c-3), alleging Mother's conduct, and dismissed the allegation in paragraph (b-2). The court noted that Mother's testimony was not credible.

Thereafter, the court awarded Father sole legal and physical custody, with supervised visitation ordered for Mother, once a month for two hours, and ordered the matter dismissed. Mother appealed.

## DISCUSSION

1. *The Trial Court Did Not Abuse Its Discretion in Excluding Mother's Proffered Evidence.*

Mother argues the trial court erred in excluding the testimony of two witnesses, Dr. Khan, proffered as an expert in document review who would testify that the frequent medical examinations of the child at the Mother's behest were reasonable, and Dr. Dobson, a psychologist retained to evaluate Mother to determine her credibility. The trial court determined that Dr. Khan did not qualify as an expert on the proposed subject of her testimony and ruled that Dr. Dobson's testimony was irrelevant because Mother's mental health was not at issue and because Mother's credibility was a matter on which the court would decide. We conclude there was no error in these rulings.

19

a. *General Principles and Standard of Review*

The trial court is vested with broad discretion in ruling on the admissibility of evidence. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 911; *In re S.A.* (2010) 182 Cal.App.4th 1128, 1135.) "We review the evidentiary rulings of the juvenile court for abuse of discretion, and will not disturb those rulings in the absence of a showing of a manifest abuse of that discretion." (*In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1249; see also, *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1176.) " ' "[T]he court's ruling will be upset only if there is a clear showing of an abuse of discretion." ' " (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 121 (*Jordan R.*), quoting *Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431.) " ' " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " ' " (*Jordan R.*, at p. 121.)

"Expert opinion testimony is admissible only if it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Watson* (2008) 43 Cal.4th 652, 692, quoting Evid. Code, § 801, subd. (a).) "When expert opinion is offered, much must be left to the trial court's discretion." (*People v. Carpenter* (1997) 15 Cal.4th 312, 403.) "The trial court has broad discretion in deciding whether to admit or exclude expert testimony (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196), and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion. [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 425-426 (*McDowell*).) In particular, "[e]rror

regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness ' " 'clearly lacks qualification as an expert.' " ' [Citation.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 162, italics omitted.)

Whether the proffered testimony adds sufficiently to the trier of fact's " ' "common fund of information" ' " (*Summers v. A.L. Gilbert Co*. (1999) 69 Cal.App.4th 1155, 1169) is a judgment call left to the trial court's broad discretion, which we review for abuse of discretion. (*McDowell*, *supra*, 54 Cal.4th at p. 426.)

b.      *Admissibility of Dr. Khan's Testimony*

Mother called Dr. Khan as an expert in medical document review, arguing the testimony was relevant to the issue of the reasonableness of the numerous medical visits to which Mother had taken the child for examination following Father's visits.  The trial court ruled Dr. Khan did not possess the level of expertise that would help the court in determining the veracity of the allegations, and that the witness would need to have some specialty regarding sexual abuse investigations to qualify as an expert on the issue of whether she was qualified to determine from reviewing the reports that Mother's suspicion of sexual abuse was reasonable.  The court also ruled that testimony as to the records Dr. Khan reviewed and whether " 'the visits were within reason, or if it was unacceptable,' " was cumulative.  On appeal, Mother argues the rulings were erroneous. We disagree.

"Evidence Code section 801, subdivision (b), [provides] 'that the matter underlying an expert's opinion be "of a type that reasonably may be relied upon by an

21

expert in forming an opinion upon the subject to which his testimony relates." Thus, there must be some showing that the material on which the expert bases his or her opinion . . . is reliable.' [Citation.]" (*In re Mark C.* (1992) 7 Cal.App.4th 433, 444-445.)

"Further, under Evidence Code sections 801, subdivision (b), and 802, the court must act as a gatekeeper to ensure the opinions offered by an expert are not 'based on reasons unsupported by the material on which the expert relies.' " (*People v. Azcona* (2020) 58 Cal.App.5th 504, 513, citing *Sargon Enterprises*, *Inc*. *v. University of Southern California* (2012) 55 Cal.4th 747, 771.)

Here, the offer of proof as to the relevance and admissibility of Dr. Khan's testimony was her expertise in reviewing medical records to determine the reasonableness of the numerous medical visits, but the Evidence Code section 402 hearing established no expertise in reviewing medical records for evidence of sexual abuse, nor in determining the reasonableness of numerous doctor visits. Dr. Khan's curriculum vitae stated she focuses on "Management of chronic illnesses, including diabetes, hypertension, obesity, chronic pain, addiction, obstetrics, family planning. Serving a diverse, underserved population with panel size of 1200 including adult and pediatrics." (Italics omitted.)

Moreover, during an Evidence Code section 402 hearing regarding Dr. Khan's qualifications as an expert, she testified she is a family practice doctor who is not regularly consulted to review records of examinations to determine if allegations of suspected abuse or neglect are reasonable (other than her experience examining her own

patients and reporting suspected abuse or neglect herself). Based on this proffer, the court concluded Dr. Khan lacked the experience or training to offer an opinion on the reasonableness of Mother's numerous doctor visits with A.P.

The reasonableness of Mother's persistent visits to medical professionals and the referrals she initiated to involve the Department in her quest to restrict Father's exercise of visitation rights was for the court to decide, given that the nature of the allegations in the petition related to the infliction of emotional harm on the child. Even if Dr. Khan qualified as an expert in document review, that expertise could not aid the court in deciding if Mother had caused or was at risk of causing severe emotional harm on A.P. Indeed, as early as March 8, 2023, the LLUMC social worker, who was contacted by Mother and the maternal grandfather "several times" to inquire if the social worker had called in the referral for abuse, cautioned Mother about taking the child to unnecessary medical examinations after finding no signs of abuse or neglect.

Mother focuses on the fact that whenever she took the child to a doctor (immediately after one of Father's visits) there were "positive findings" each time. But none of the findings was pertinent to abuse or neglect and the frequency of visits had an obvious impact on the child, given the reports of her behavior when taken for a medical appointment. In fact, the child was so traumatized that when the court ordered a C.A.C. interview, the child refused to cooperate.

Contrary to Mother's assertions, Dr. Khan did not establish an expertise in medical records review *or* in assessing whether a parent's suspicions of abuse or neglect are

reasonable from reviewing records pertaining to examinations conducted for various other purposes, such as possible head injury from a fall distant behavior, or even symptoms of vaginitis.[10]  Reviewing such records would not be relevant to an opinion on whether Mother reasonably suspected abuse or neglect, and certainly did not aid the court in deciding whether the numerous doctor visits caused, or was at substantial risk of causing, emotional harm to the child.

We appreciate that "[a]lthough an expert may base an opinion on hearsay, the trial court may exclude from the expert's testimony 'any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value.' " (*People v. Pollock* (2004) 32 Cal.4th 1153, 1172 (*Pollock*), quoting *People v. Montiel* (1993) 5 Cal.4th 877, 919.)  In *Pollock,* the reviewing court affirmed the trial court's ruling excluding the expert's opinion because that opinion was based on defendant's "potentially self-serving and unreliable hearsay." (*Pollock*, at p. 1172.)

We assume that if Dr. Khan reviewed the medical records of the numerous medical exams to which Mother subjected her child, the doctor would have noticed that except where mother urged a practitioner to make a referral to the Department, all examiners found nothing that raised concerns for the child's safety after examining the child. Dr. Khan did not examine the child, although she testified she had treated children in her

---

[10] "Vulvovaginitis in toddlers is the inflammation or swelling of their vulva and vagina. Symptoms include redness, soreness and itching in your child's vaginal area.  The most common cause of vulvovaginitis in toddlers are irritants such as harsh soaps, bubble baths and tight-fitting clothing.  Treatment typically involves eliminating the irritants." (<Https://my.clevelandclinic.org/health/diseases/22488-vulvovaginitis-toddler> [as of Apr. 07, 2025].)

family practice. Dr. Khan's experience in her own practice, in which she did not do consultations for sexual abuse, was not relevant to the question before the court, which was whether the numerous medical appointments caused emotional harm. Dr. Khan's review of records of A.P.'s medical visits would elicit only an opinion grounded on Mother's self-serving and unreliable statements.

At oral argument, Mother's counsel argued that Dr. Khan's testimony should nonetheless have been admitted, citing *Brown v. Colm* (1974) 11 Cal.3d 639, where, at page 647, the California Supreme Court noted that a court will be deemed to have abused its discretion in excluding expert testimony if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go before the jury. We agree with this general principle. The problem here is that the expert witness did not disclose sufficient knowledge on the subject of document review, the subject on which her testimony had been proffered, to entitle the witness to testify as an expert on that subject, and the fact she did not examine the child herself rendered any opinions the doctor may have had on the reasonableness of Mother's conduct of questionable value.

Therefore, it was not an abuse of discretion to exclude the witness's testimony.

c. *Admissibility of Dr. Dobson's Testimony*

Mother contends the court erroneously excluded the testimony Dr. Dobson, concerning her "thorough exam, three-hour interview with the mother and two hours of testing," as well as "her review of the medical records and other documents and recordings, to: (1) address the reasonableness of mother's actions in connection with the

25

two jurisdictional counts alleging that mother unreasonably took the child to the doctor visits and/or subjected the minor to manipulation and coaching 'for sympathy,' (2) whether mother acted reasonably in discussing the child's 'uncharacteristic behaviors' and requesting welfare checks; (3) to address that mother's mental state did not show signs of factitious disorder by proxy or other mental condition and (4) for the purpose of the effect on mother of Dr. Dobson's statements of concern about possible sexual abuse or exposure, that is, whether " '[m]other acted reasonably based on the information she had at the time' " in making her requests for welfare checks." We disagree.

Mother's mental health was not at issue because no ground for jurisdiction alleged the child was described by section 300 as a result of Mother's inability to properly care for her due to mental illness. For this reason, Dr. Dobson's opinion about her findings on the issue of whether Mother's mental health showed signs of factitious disorder by proxy or other mental condition was irrelevant. A parent does not need to be diagnosed with a mental disorder to expose her child to severe emotional harm by repeatedly subjecting the child to unnecessary medical examination to obtain a modification of a custody order.

Additionally, Dr. Dobson's letter to the Department revealed that Dr. Dobson's conclusion was that Mother was telling the truth, which is not a proper subject for expert opinion.[11] Further, Dr. Dobson's opinion that A.P. had been sexually abused was based solely on Mother's statements, rather than an examination of the child. (See *Pollock*,

---

[11] Dr. Dobson's letter to the Department stated, "After reviewing the medical appointments and interviewing the mother for three hours, including valid[] psychological assessments, I believe the mother to be telling the truth."

26

*supra*, 32 Cal.4th at p. 1172.)  Additionally, Mother failed to establish that Dr. Dobson was an expert at diagnosing sexual abuse of a person who was not personally evaluated. Although Dr. Dobson indicated she had reviewed the records filed in the dependency, including the medical records provided by Mother, she did not interview A.P.  Instead, the complaints of suspected sexual abuse were related to Dr. Dobson solely by Mother, whose credibility was not enhanced by the psychologist's proffered opinion that Mother was telling the truth.  It was therefore not likely to assist the trier of fact.

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.  Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert."  (Evid. Code, § 720, subd. (a).)

Because Dr. Dobson proposed to render an opinion that A.P. had been sexually abused based solely on Mother's reports of her unusual behavior, it was not unlike the proffer of Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence to prove that a child was sexually abused.  (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 ["It is beyond dispute that CSAAS testimony is inadmissible to prove that a molestation actually occurred.].")  "[I]t is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility *of an alleged child victim of sexual abuse*."  (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171, italics added.)

Mother was not the victim of alleged child sexual abuse, so Dr. Dobson's "fear for the safety of the mother due to her ex-husband's retaliation" was irrelevant and inadmissible.

Dr. Dobson asserted her qualifications as a forensic psychologist working with victims of sexual violence. However, her curriculum vitae indicates her specialty is working with sexual offenders, not victims. In any event, Mother was not a victim of sexual abuse and there is nothing in the record to suggest that Dr. Dobson personally observed the child's behaviors as described by Mother, or that she attempted to corroborate Mother's statements before making a formal report of suspected sexual abuse by Father.

If, indeed, Dr. Dobson reviewed all the medical and dependency records, she would have discerned that there were no physical findings of abuse or neglect of the child by Father, and that the child's behavior was found to be quite normal and happy during each welfare check and interview by social workers, except where the prospect of a medical examination was anticipated by the child.

Dr. Dobson's reliability as an expert on any topic was properly questioned at trial where she contradicted the medical findings of the doctors who personally examined the child, and who were concerned that Mother was unnecessarily subjecting the child to numerous medical examinations, in favor of an opinion grounded solely on Mother's contrary, self-serving statements.

Mother also argues that the evidence was relevant and admissible as character evidence, because Mother's character was at issue. To the contrary, Mother's character

was not at issue, and the general rule of Evidence Code section 1101, subdivision (a), precludes the admission of character evidence to prove conduct on a specified occasion. (See, *In re Mark C.* (1992) 7 Cal.App.4th 433, 442 [father's proffer of expert testimony of father's physiological arousal test results to show he did not sexually abuse the minor held to be inadmissible as character evidence].)

On the issue of whether a parent's *conduct* has brought his or her child within the definition of a dependent child pursuant to section 300, the credibility of Mother was at issue, but not her character. Dr. Dobson's curriculum vitae does not indicate any long term familiarity with Mother's reputation for truthfulness (although the psychologist's background with LLUMC would suggest such familiarity was possible), and such reputation evidence does not require the testimony of an expert.

The bottom line is that Mother proffered an opinion based solely on her own self-serving and unreliable statements to prove the truth of her own statements. (*Pollock*, *supra*, 32 Cal.4th at p. 1172.) Dr. Dobson may or may not have been an expert in child sexual abuse, but the court was confronted with an opinion that sexual abuse had occurred, prompting a second referral to the Department alleging sexual abuse at Mother's urging, that was not based on an evaluation of the alleged victim of abuse. Instead, the psychologist's opinion was based solely on statements of Mother, which had been previously investigated and rejected.

Because Dr. Dobson's proffered opinion that Mother did not suffer from a mental illness and that she was truthful was irrelevant, the trial court properly excluded the testimony of Dr. Dobson.

2.      *The Jurisdictional Findings are Supported by Substantial Evidence.*

Mother claims there is no substantial evidence to support the jurisdictional findings, requiring reversal.  We disagree.

We review a juvenile court's jurisdictional findings for substantial evidence.  (*In re R.T.* (2017) 3 Cal.5th 622, 633.)  Under this standard of review, we determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order, resolving all conflicts in support of the determination and indulging all legitimate inferences to uphold the lower court's ruling.  (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212 (*John V.*); *In re Katrina C.* (1988) 201 Cal.App.3d 540, 547.)  If there is substantial evidence to support the juvenile court's order, we must uphold the order even if other evidence would support a contrary conclusion.  (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.)

When the juvenile court has exercised jurisdiction on more than one ground, the reviewing court need find that only one ground is valid in order to sustain the order.  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

A court may assert dependency jurisdiction under section 300, subdivision (c), when " '[t]he minor is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression,

30

withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care.' " "The statute thus sanctions intervention by the dependency system in two situations: (1) when parental action or inaction causes the emotional harm, i.e., when parental fault can be shown; and (2) when the child is suffering serious emotional damage due to no parental fault or neglect, but the parent or parents are unable themselves to provide adequate mental health treatment." (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557.)

" 'While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' [Citation.] Standing alone, the past infliction of harm does not establish the substantial risk of future harm. Rather, ' "there must be some reason to believe the acts may continue in the future." ' [Citation.]" (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379.)

Here, there is no question that A.P. suffered severe emotional harm: she regressed in her potty training, had meltdowns at the thought of going to the doctor, and, according to Mother, she was withdrawn and experienced nausea and anxiety. However, it was Mother's persistence in seeking examinations of the child that caused the trauma, as borne out by the evidence that the child behaved normally while at Father's residence during visitation, except at the prospect of going for a medical appointment.

It is ironic that a medical doctor has fomented such feelings of fear and anxiety in a child at the prospect of going to a doctor's office, but the great weight of the evidence supported the allegation that Mother had caused the child's symptoms of trauma through her ongoing campaign by regularly questioning the child about being abused or neglected while at Father's home, then taking the child for medical examinations, which included genitourinary examinations, and frequently recording the child as Mother questioned her.

There was ample evidence the child suffered the statutorily described symptoms of emotional abuse, and there was overwhelming evidence that Mother's conduct in taking the child to numerous unnecessary medical appointments was the cause. Additionally, the court was presented with evidence that the emotional abuse would continue unless the court exercised jurisdiction: promptly after the Department recommended dismissal of jurisdiction with exit orders, Mother renewed her efforts to frustrate Father's visitation rights and undermine his relationship with A.P.

At oral argument, Mother requested that we address the issue of parental autonomy in connection with the question of whether mother's actions fell within the spectrum of reasonably prudent parental decisions. She argues that of the various medical appointments to which she took the child, positive findings were made. However, none of the positive findings related to suspected abuse, which was rejected at each visit. Nor does it mitigate Mother's pattern of behavior when considered in light of the several calls to law enforcement seeking welfare checks on the child while in Father's household.

We agree as a general principle that fit parents have a fundamental right to make decisions concerning the care, custody, and control of their children, which is provided by the Due Process Clause of the Fourteenth Amendment. (*Troxel v. Granville* (2000) 530 U.S. 57, 66.) "Parental autonomy, however, is not absolute. The state is the guardian of society's basic values. Under the doctrine of *parens patriae*, the state has a right, indeed, a duty, to protect children. (See e.g., *Prince* v. *Massachusett* [1944]*, supra*, 321 U.S. 158 at p. 166.) State officials may interfere in family matters to safeguard the child's health, educational development and emotional well-being." (*In re Phillip B.* (1979) 92 Cal.App.3d 796, 801; see, *In re Petra B.* (1989) 216 Cal.App.3d 1163, 1171.)

In the present case, Mother initiated the involvement of the Department by urging first Dr. Lamb, and later Dr. Dobson, to make referrals to the Department and contacting law enforcement to conduct welfare checks on the child while at Father's residence. She cannot now complain that her continuous efforts to have the child removed from Father revealed the risk that she, herself, posed respecting the child's emotional health. The Department discharged its *parens patriae* duty to investigate the allegations in the interest of child protection.

There is substantial evidence to support the jurisdictional findings under section 300, subdivision (c).

3.      *The Dispositional Order was Proper.*

Mother asserts that the dispositional order removing the child from her custody was not supported by substantial evidence. We disagree.

When a minor has been adjudged a dependent child of the court on the ground that he or she is a person described by section 300, the court may limit the control to be exercised over the dependent child by the parent or guardian. (§ 361, subd. (a).) A dependent child may not be taken from the physical custody of his or her parents or guardians unless the juvenile court finds, by clear and convincing evidence, certain circumstances exist. (§ 361, subd. (c).) Such findings include the finding that there is or would be a "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor," is one of the circumstances that justifies removal. (§ 361, subd. (c)(1).)

A juvenile court's "dispositional findings are reviewed for substantial evidence." (*In re G.C.* (2020) 48 Cal.App.5th 257, 264-265, citing *In re Lana S.* (2012) 207 Cal.App.4th 94, 105 (*Lana S.*).) Under this standard, we determine whether there is any substantial evidence, contradicted or uncontradicted, which supports the conclusion of the trier of fact. (*In re Tracy Z.* (1987) 195 Cal.App.3d 107, 113.) All evidentiary conflicts are resolved in favor of the respondent, and where more than one inference can reasonably be deduced from the facts, we cannot substitute our own deductions for those of the trier of fact. (*John V.*, *supra*, 5 Cal.App.4th at p. 1212.)

In dependency proceedings, the burden of proof is substantially greater at the dispositional phase than it is at the jurisdictional phase if the minor is to be removed from

his or her home or the physical custody of a parent. (*In re I.R.* (2021) 61 Cal.App.5th 510, 520 (*I.R.*).) Section 361, subdivision (a)(1), provides "In all cases in which a minor is adjudged a dependent child of the court on the ground that the minor is a person described by Section 300, the court may limit the control to be exercised over the dependent child by any parent, guardian, or Indian custodian and shall by its order clearly and specifically set forth all those limitations."

However, section 361, subdivision (c), addresses situations in which the child is removed from one or both parents' custody. That section provides that a "dependent child shall not be taken from the physical custody of their parents, guardian or guardians, or Indian custodian with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence" that "there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's, guardian's, or Indian custodian's physical custody." (§ 361, subd. (c)(1).)

In making the determination under section 361, subdivision (c), a court may consider a parent's past conduct because it is a good predictor of future behavior, along with the present circumstances. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133; *In re Maria R.* (2010) 185 Cal.App.4th 48, 70.) " ' "Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of

danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child." ' " (*Lana S.*, *supra*, 207 Cal.App.4th at p. 105, citing *In re A.S.* (2011) 202 Cal.App.4th 237, 247, overruled on a different ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 & § 361, subd. (c)(1).)

"A finding of parental abuse cannot alone provide the clear and convincing evidence necessary to justify removing a child. [Citations.] Rather, the juvenile court must determine whether a child will be in substantial danger if permitted to remain in the parent's physical custody, considering not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*I.R.*, *supra*, 61 Cal.App.5th at p. 520.)

"Whether the conditions in the home present a risk of harm to the child is a factual issue." (*In re N.M.* (2011) 197 Cal.App.4th 159, 170.) The court's dispositional finding is subject to a sufficiency of the evidence standard of review. (*Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1078.)

Here, the court made the appropriate findings respecting Mother, and the record provides substantial evidence to support the findings that her continued custody posed a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being. Further, the record also supports the finding that the child's physical health cannot be protected without removing the child from Mother's custody. Moreover, current circumstances supported that finding, given that when Mother was granted more liberalized visitation with the child in her care, she immediately resumed

36

her pattern of reporting suspected abuse by Father based solely on matters Mother had previously reported. Where the child has already suffered serious emotional abuse from the numerous medical visits and Mother's constant questioning of the child, the evidence that Mother resumed the harmful conduct after months of services demonstrates that reasonable alternatives to removal would not be sufficient to protect the child.

Additionally, section 361 provides, "The court shall consider, as a reasonable means to protect the minor, each of the following: [¶] (A) The option of removing an offending parent, guardian, or Indian custodian from the home. [¶] (B) Allowing a nonoffending parent, guardian, or Indian custodian to retain physical custody as long as that parent, guardian, or Indian custodian presents a plan acceptable to the court demonstrating that they will be able to protect the child from future harm." (§ 361, subd. (c)(1).)

Here, the court determined that placement with the noncustodial parent would not be detrimental to the safety, protection, or physical or emotional well-being of the child in following the social worker's recommendation to award custody to Father as the non-offending parent. The court found that Father was a noncustodial parent who was willing and able to assume custody of the child. Additionally, given the child's improvement while in Father's care (there were no reports of anxiety, nausea, or other uncharacteristic behavior), the record supports a determination that placement of the child in his custody would not be detrimental.

On the other hand, there was evidence that if the child were returned to Mother's custody, Mother would once again renew her efforts to limit Father's visitation and his relationship with A.P., because she had done so at every opportunity. The child, by the time the petition had been filed, had already suffered severe emotional damage due to Mother's conduct, such that placement with Father was necessitated for the child's well-being. Mother's readily access to LLUMC facilities and its medical professionals increased the risk of further emotional harm and suffering to the child.

There is substantial evidence to support the dispositional orders by the court by placing A.P. in the sole legal and physical custody of her father, with supervised visitation for the Mother.[12]

---

[12] Mother has submitted a letter on October 24, 2024, concerning the current status of her visitation in family court. She asserts she has done so pursuant to the duty of dependency counsel to bring to the appellate court's attention post-appellate rulings by the juvenile court that affect whether the appellate court can or should proceed to the merits, citing *In re N.S.* (2016) 245 Cal.App.4th 53, 58. However, the information contained in the letter does not address post-appellate rulings that affect whether this court can or should proceed to the merits. Instead, it pertains to the family court's orders gradually liberalizing visitation and does not render moot the questions addressed to us. The information does not aid or affect our review of the correctness of the juvenile court's rulings, so we do not consider it.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____

P. J.

We concur:


MILLER_____

J.


FIELDS_____

J.